**MARK A. MARINO, PC**
380 Lexington Avenue, 17th Floor
New York, New York 10168

Tel: 212.748.9552                                                                    mmarino@marino-law.com
Fax: 646.219.5350

September 9, 2016

*Via ECF*
Hon. Brian M. Cogan
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re: *Wade v. Zambrano, et al.*, 15-cv-6542-BMC
> Plaintiff's Request for Pre-Motion Conference

Dear Judge Cogan:

I am the attorney for the plaintiff, Che Wade ("Plaintiff" or "Mr. Wade"), in this civil rights action for false arrest and use of excessive force against three members of the NYPD and the City of New York (collectively, "Defendants"). In accordance with the Court's individual rules, I submit this letter respectfully requesting a pre-motion conference in anticipation of filing a motion for partial summary judgment on the issue of liability for Mr. Wade's claim for false arrest.

## Statement of Relevant Facts

On November 17, 2012, Defendant Sgt. Michael Weber ("Sgt. Weber") led a ten-person team on a "buy and bust" operation. Defendant Det. Orlen Zambrano ("Det. Zambrano"), Defendant Det. Michael Parks ("Det. Parks"), and two undercover officers (the "Undercovers") were part of that team. The buy and bust operation entailed the Undercovers going to specific target locations enumerated on a NYPD Tactical Plan in order to initiate and/or execute narcotics sales. The other team members were there to support the two Undercovers – not to engage in any type of affirmative action, such as setting up (or participating in) an organized sting operation.

According to Det. Zambrano and Det. Parks (collectively, the "Detectives"), at approximately 7:30 p.m., one of the Undercovers transmitted a message to the team (the "Transmission"), stating, in relevant part, that as the Undercovers were walking along Nostrand Avenue, a man (the "Suspect") was following them and calling attention to their status as undercover police officers to the neighborhood, thus blowing their cover. In addition, the only known description of the Suspect during the Transmission was "black male."

The Detectives displayed a lack of reasonable suspicion to lawfully stop the Suspect when they testified, during their depositions and/or interviews performed by the CCRB, that the Transmission did not indicate or give them any reason to believe the Suspect did any of the following:

- direct his speech toward a specific group of people, such as known drug dealers (but rather to members of the neighborhood at large);
- interfere with a specific narcotics sale or conversation between the Undercovers and any suspected drug dealers;
- disturb a defined area of police activity, such as a sting operation;
- receive any prior warning from law enforcement to disperse;
- physically engage or threaten the Undercovers;
- stand in front of the Undercovers and/or physically impede their progress; or
- cause anyone in the neighborhood to physically react (for example, by running away).

Despite their lack of reasonable suspicion, the Detectives set out to locate and approach the Suspect based on the vague description of a "black male." Mr. Wade, a production assistant wearing his work clothes, was minding his business on the corner of Nostrand Avenue and Quincy Street when the Detectives drove their car up to the curb and approached him based on the color of his skin.

The versions of events diverge greatly after the Detectives approached Mr. Wade. According to Mr. Wade, Det. Zambrano bent his wrist back and hit him in the groin several times (while handcuffed) to the point where the pain caused him to fall against the police car and break the side mirror on his way to the ground, after which Det. Zambrano searched him and found an alleged gravity knife (which Mr. Wade used on the sets of commercials and television shows). Det. Zambrano, on the other hand, asserts that Mr. Wade moved his arms, which he perceived as a threat, so he handcuffed and searched Mr. Wade, at which time he found the alleged gravity knife. Eventually, the Undercovers arrived and confirmed that Mr. Wade was not the Suspect. Mr. Wade then went to the hospital to get treatment for his injuries.

## **Argument**

Blowing an undercover police officer's cover is only a crime if the speech/warning is targeted to a ***specific*** group of people who are engaging in known criminal activity and are subject to ***imminent*** police action. Wood v. Town of East Hampton, 2014 WL 60087 at *8-9 (E.D.N.Y. Jan. 7, 2014). Here, it is the Suspect's actions – not Mr. Wade's actions – that are relevant because the analysis revolves around what Det. Zambrano (and Det. Parks) believed at the time of the arrest. The Suspect (not Mr. Wade) allegedly followed the Undercovers and warned whoever would listen that they were police officers. Citizens have the right to this type of free speech, no matter how distasteful it may be (except in certain situations not present here). As a result, Mr. Wade paid the price for a crime that was not even committed simply by virtue of being a black man.

In Wood, the plaintiff in a civil rights action approached two Hispanic men on a sidewalk and stated, "Policia, black car down there." Id. at *9. Indeed, there was a police officer in a car nearby. Id. The court found no probable cause for an arrest for obstruction of governmental administration because, among other things, there was no indication that "anyone or anything effectively defined this particular area of the public sidewalk as an area of police activity, and Plaintiff had received no advanced warnings of that nature." Id. In addition, the statement was not directed toward a "known area of criminal activity" and there was no evidence of a physical reaction or crowd dispersal upon the warning. Id. The Wood court arrived at its conclusion, in part, by distinguishing two cases which indicate that "blowing up an undercover" may justify a charge of obstructing governmental administration in circumstances not present here. Id.; see In re Davan L., 91 N.Y.2d 88, 90 (N.Y. 1997) (finding of guilt where a man, who was previously warned by an undercover police officer to stay away from a police operation set up at a store front, purposely went back to the store and yelled "cops, cops, watch out, Five-0, police are coming"); see People v. Covington, 18 A.D.3d 65, 65-66 (1st Dep't 2005) (finding of guilt where a man shouted "the police are coming" at an apartment building from directly in front of the building as a team of twenty officers entered, including members of a SWAT team).

Here, as in Wood, the Suspect was allegedly telling members of the public, *indiscriminately*, to stay away from the Undercovers because they are police officers, whereas the defendants in Davan L. and Covington knew the police were running coordinated and impending operations about which the intended audience had no knowledge. Sgt. Weber's team was not running any such operation – the two Undercovers were moving from suspected location to suspected location – and as the Detectives stated during their depositions, the Transmission gave no indication that the Undercovers were even engaged in a narcotics sale (or even speaking to a drug dealer) while walking on Nostrand Avenue. The Detectives further admitted that there was no reason to believe the Suspect had impeded the Undercovers or physically engaged them in any way. See People v. Case, 365 N.E.2d 872, 875 (N.Y. 1977) ("mere words alone do not … support the charge of obstructing governmental administration"). Finally, there was no indication that anyone ever warned the Suspect to stay away.

## Conclusion

The Detectives stopped Mr. Wade without reasonable suspicion that the Suspect had obstructed governmental administration. Thus, Plaintiff requests a pre-motion conference regarding the validity of the initial stop by the Detectives. Mr. Wade, identified as a black male, paid the price for a crime that was not even committed.

Respectfully submitted,

/s/

Mark Marino

cc:   Nana Sarpong, Esq. (*counsel for Defendants, via ECF*)